Good morning, be seated please. As I did in the first document, I want to thank Mr. Evans for coming in person, traveling from Colorado, I believe. We deeply appreciate that. You ought to be qualified for a gold medal of some sort, given the current views about COVID here and there. Also, Ms. Cloutier, are you there? Yes, ma'am, I'm here. Can you hear us? I can. And I will say I'm sorry you could not appear in person. I hope your health is alright. And I will say that we went to this device for having your appearance by telephone not to punish you, but because it is a practical solution to the problem that Mr. Cloutier came in from out of town to argue. And I myself had to participate in a court of appeals proceeding from by telephone a couple of years ago when I was recovering from surgery and it worked. I thought it worked perfectly well. So if at any point you feel you cannot hear the presentation, please feel free to let us know. And I will say you're excused from having to put your little cover over the microphone, which the counsel in the courtroom here have to do. So with that, I will call case number 19-10350, Solomon v. Cronkey, Sports and Entertainment, and recognize you, Ms. Cloutier. Hi, ma'am. My name is Suzanne Cloutier, and I represent the appellant. You can make your argument. You have 20 minutes, and we'll let you know if you start to run over. Okay, thank you very much. May I speak to the court? I received an email here today from the court that this panel is interested in resubmitting the Williams and Ryan cases. And first of all, it's not brief, and probably for the, or at least for the appeal, it's a slip of the tongue that the panel allows us to present, and an outsider could present a brief on the matter, to have it on the record. But I would like to start there and ask the panel to ask me for a call and request to start a different case. You can do the briefing later. Okay, thank you. And I would like to start again, talking about the Williams and Ryan rule, which was a reasonably resounding ruling. The court, in the sense, had only expressed its disappointment for, you know, not feeling like the issue had really been resolved, whether or not Ryan was supposed to log, and whether or not the complete devastation of the Williams was very narrow, dealing with a swarming motion, a gestation, and it's really not very objective in our case, because we're not dealing with a situation where the appellant had voluntarily withdrawn and cleaned, and without precedent. In the situation here, the appellant did not, was not represented as a counsel, as an entity, as a default section, or a default presenter against TMT. The appellant himself did not request that those claims be withdrawn without precedent. The situation, we believe, because the purpose is expressly stated in Ryan, in Williams, and in another case file, we still get that the purpose of this rule is to prevent parties from voluntarily dismissing their remaining claims as they wait to manufacture a final judgment, or, in other words, clean the person. And that is not what's occurring here. So I would suggest that Ryan should be narrowed to include, potentially, only cases where the appellant has voluntarily dismissed claims. Ms. Klugner, we can't narrow Ryan, though, as a three-judge panel, can we? And as a follow-up, is it true that the final judgment that was entered in this case only did not apply to that dangling party? And so there is no final judgment that resolves the issue with that dangling party? So those are two questions. The final judgment does not specify either way. It just states that the judgment is entered. But the purpose, what was kind of, what was brought up in the defense, in the Williams case, was that he really can't under Rule 41A dismiss only one party or only one claim and that Rule 55A would be the rule applicable here. And then, of course, the jurisdiction can be given under 28 U.S.C. 1924-91. As the defense mentioned in Williams, that statute is broader and actually includes not the final judgment but a final decision. But there's a distinction, as was mentioned in the defense case, in reducing Ryan as final judgment and final decision are different and final decision is broader. If there's nothing left to appeal and nothing left to alleviate at the end of the case when the final judgment is entered, that would constitute a final decision. In this particular case, because the default was entered 72 years prior to the end of the judgment entered in the case, there would be nothing left for the court to do at the district court level but to just enter a judgment either way and order either way on that default. But it did not do so. Ms. Cloutier, I don't wish for you to use up your entire argument on this subject. I think that would be most unfortunate given the fact that you're allowed to file a post-argument brief. I would throw out this suggestion. I'm not diminishing the importance of this issue, appellate jurisdiction, but it seems to me this is more like those cases where parties appeal and the court discovers that no final judgment was entered formally under Rule 58, in which case, as I recall it, our practice is just to hold open the case, have a limited remand, get the court to enter the final judgment, and then we proceed forward. So in your briefing, I would appreciate if you'd consider that as well. Ms. Cloutier, you would like me to step over onto our question and answer part of my argument? Well, I assume you would want to do that. I would like to make sure that the court is satisfied with the position on me. This is a jurisdictional issue and I will submit a post-admission brief on that. I would like to start with a breach of contract. That's the primary criminal case and the term sheet was part of the contract that was breached. And it happened exclusively under them, which I'm sure the court has analyzed very carefully. But where the court went wrong is finding that the breach instruction A-2 was contingent on breaching section A-1. But the claim that you looked at the term sheet was not towards that conclusion. It does not say that you have to breach the section A-2 in order to breach section A-1. There were a couple of issues that were raised in the order, one being that the contract was on a mandate to it. The condition of the accountant is that the court does not have the authority to determine the event and date of the dispute as a matter of law, case law, such as myself. I was unsure, and a number of other people decided it was a breach, based on that. The contract is an objective of tax collection, not appropriated for somebody's judgment. But in a hearing you said it was not ambiguous. Well, that took an extra jump of thought because that hearing was not related to the motion for somebody's judgment at all. But it doesn't really matter. As a judicial matter, you've waived the issue of ambiguity. You've waived the right to raise that issue. Well, respectfully, the counsel that represented all of them at that hearing did not make that statement as an intentional waiver. Case law courts do in order to waive a right to raise an issue later, it does not have to be an intentional waiver. It did expressfully state in that hearing that it was not ready to have a hearing on the motion for somebody's judgment. It was simply an issue of the offer being limited to that motion. So I believe that that was not an intentional waiver of that issue. And so even if that were out of the question, there was still sufficient evidence that the term sheet was briefed. The parties did not include it in the March 21st letter. The court made a legal determination that that was unintentional. The preliminary determinations are in Missouri's representation. It's not the rule of law. It's very developed in both Texas law and also in federal courts. Opposing counsel argues that the court did not make a determination that it was unintentional. And then in any case, it's irrelevant whether it was unintentional or not. How do you have the facts issue here? Well, the fact that they did not, that they left him off the letter to try to, and there's an influence that can be drawn that they left him off the letter to so condemn the accusation. They also, I apologize, I don't know if anyone else is standing there. They also built some testimony throughout the discovery process that Mr. Tomlin was identifying other parties to the term sheet, which is a violation of his facility position. Then also evidence was shown that KFC obtained a copy of the term sheet prior to his expiration. There could provide confirmances that he, that it was intentional, that they intentionally left him off. That extension did not become effective. All parties agree to that, correct? Even though, even if Mr. Solomon's name was intentionally left off of the March 21 letter, everyone agrees, do they not, that that letter had no binding effect for that reason? That the letter had no binding effect. But the letter in itself is an inferential evidence that the exclusivity provision was breached because they were not allowed to solicit, or encourage, or accept, or locate, or any potential offer for the subsidiary. So the fact that the letter was even in existence, it's found in itself is some potential evidence that he, that it certainly couldn't, or that they were attempting to circumvent the exclusivity provision and actually breach it. Well, but they didn't, because in the end, when Crown Keeper bought out the parent company, nothing happened to, I get, I get the companies confused, the one that Solomon was running at, at war, right? Or no, ACB. That's the two camera companies. But I mean, Crown Keeper bought out the parent company, and all the stock of the subsidiary went with it. But nobody, undercut, interfered with Solomon's attempt to purchase the subsidiary, it just fell apart. I don't believe that the evidence is as clear as the matter of law. The, you know, the standard that the court focused on, that the sale of stock after the parent company did not replace the sale of the entity subsidiary automatically, you know, that is a rule of law. However, the, the different, you know, ethnic of evidence that was presented by Solomon did show that there was discussion about obtaining the subsidiary without, with, with, which is, and which is a breach of the exclusivity provision. I believe it fell apart because the purpose of the parent company, the, the, the purpose of not going to enter into with Solomon did not, you know, did not really, it was not, it didn't go away because the parent company was sold. What evidence do you have in the record that do you point to that they interfered with the company? You said there's some evidence in the record. What is that evidence specifically? Um, the, um, there was a meeting on March 5th, 2013, that, um, they discussed the potential sale of the subsidiary to KSB as an outdoor development, the, the potential sale of the subsidiary. Um, the requisition testimony, um, that as an outdoor development for sale, the entire company included the subsidiary. Um, the KSB testified and believed that the offer to purchase outdoor the parent company also included ownership interest in the subsidiary. Um, they, um, the California General Counsel have called, um, the Solomon to remain in the position of the subsidiary's attorney because the interest about whoever it is doesn't offer the purchase of the entire company as a precedent for the sale of the subsidiary to me. Um, there was, there was enough evidence that, um, that they were supposedly, um, trying to push an out of the future, uh, and that the, the purchase of, uh, the parent company was happened that they were going to purchase the subsidiary and that the, that I don't believe this person has the evidence to show that that was indeed happening and wasn't, didn't occur. Um, whether or not a jury decides to find and favor of him is, um, not, this is not something that's judgment appropriate. The, the, the actual results of the discovery show that there were definitely discussions that the subsidiary would be sold as well. And that is a direct violation of his business. Did your brief give record extra record citations for this evidence? I don't recall. Yes, ma'am. It would be starting around page 20 in our opening brief, um, that was through about 20 to 23 and it does have, um, citations to the record for those. Is that found, is most of that evidence found in the response to the summary judgment motion? Um, I did not know page that in my notes. I, I can tell you the page number if you'd like. I, I don't have that. Oh no, I'll, I'll take your word for it if it's in the blue brief. It's in the opening brief that we saw from, uh, Hawker. Okay. Okay. That would be fine. Your timer is very good and you have reserved time for rebuttal. Thank you. Mr. Evans. Thank you, Judge. May it please the court, uh, Judge Jones, Judge Smith, Judge Elrod. Again, my name is Kevin Evans. I am here from Denver. I'm representing Cronky Sports Entertainment and Outdoor Channel Holdings and I very much appreciate the opportunity to present here in person. Not all courts are doing um, I traveled extensively last year, uh, in depositions, but not once in a quarter. So I really appreciate the opportunity. Um, I know you raised a question yesterday on the jurisdictional point and I want to touch upon that briefly because I think Judge Jones, your, um, resolution or suggested resolution probably takes care of it, but this may be the one area in the case where Mr. Solomon and my clients agree, which is I don't think Williams, as I read it yesterday, I don't think it overruled, um, Galactica Star or Elta Lawley. And therefore I think those cases are still good for the proposition that a final judgment, which was entered by Chief Judge Lynn, a final judgment does not need to recite Rule 54B. And it doesn't need to say this is pursuant to Rule 54B. I mean, that's what Galactica Star says. But it can't be a final judgment because the, in the same day, Judge Lynn issued another, an opinion that said, you go do some business with this other claim. So it wasn't, uh, we mean to cover everything and it just didn't, or that there's some kind of mistake. She intentionally didn't put that other entity in there because she had given them some homework. Right. So how does that affect this analysis? I apologize, Judge Elroy. She, she did give them some homework, as you say, which they've known, um, that having said that, um, I think the unmistakable intent from her order and from the record, and that's the language from the previous case, the Heidegger case, which I forgot the name of, and, and the Elta Lawton, Lawton, Elta Lawton case, um, all stand for the same proposition. The Elta Lawton case was decided I, I, last year, I don't know whether it was before or after Williams. I didn't, I didn't really dig into it that closely. I should have. Um, but I don't think that Williams rejected the proposition that the final judgment can be, uh, what she called the final judgment. I think that's what it says. Um, it's necessarily unappealable if the unmistakable intent, which is the language of those cases, of the district court was to enter a final judgment for less than all parties and all claims. And I think having been involved in this case from day one, having appeared before Chief Judge Lamb a couple of times, I think that was her unmistakable intent. But you, you have no problem, though, with the limited remand just to make sure. No. Both attorneys, I hope, understand what we mean by limited remand is that this panel keeps the case. It goes back down. There's an order entered, presumably by the district court, and then there doesn't have to be any notice of appeal or new briefing or anything. It's a, it's a fairly efficient way of clearing up any difficulties. Right. It is a very efficient way. And I, I have no objection to that. It was my, my concern was, oh my gosh, we're going to have to brief this thing again and educate new, new panel members. And if that's, that's not my understanding of how this works. And so I have no objection to that process. And, and, and Solomon, Mr. Solomon will get no objection from me along the way. So I promise that. Clothier, can you hear all right? Yes, I can hear you. Great. Thank you. So now what I'd like to do is I'd like to turn to the actual substance of this appeal and correct a few things. I'm not going to have the time, you know, in 20 minutes, I can't correct all of the issues that exist with the liberties that were taken in the briefing with respect to the record, but I want to hit on a few. But before I do that, I would like to just, and the court's already indicated that it's aware of this, but for over a quarter century, the law in Texas and the law in the state of the parent does not affect the stock of the subsidiary. In this case, two-tier subsidiary, because it was two tiers down for the essence of the subsidiary. And the capital parks case is very clear on that from this circuit, the docu-docu data and tentacle case from Texas state courts are very clear on that. And what I found interesting is that Mr. Solomon, in his opening brief, didn't even attempt to tackle those cases, particularly in my, the decision by Chief Judge Lamb. But be that as it may, they made that decision to ignore those cases. I didn't. They're dispositive. And the bottom line here is that before February 27, 2013, what's the significance of that date? The terms sheet was fully signed. Before that date, on April 16, 2013, the significance of that date is it was the day after the exclusivity period expired. On May 18, 2013, the significance of that date is that was the date after the KSC subsidiary acquired all of the outdoor stock and merged into outdoor. The aerial camera business was owned during that entire period of time, even after the merger, was owned by Wintercon Inc., which is a subsidiary of Outdoor. The undisputed evidence in this case, and it is undisputed, is unrefuted, KSC never made an offer to acquire the aerial camera business. The offer letter on February 27, which Mr. Solomon attaches, I'm sorry, Judge, I'll read your question. Go ahead and finish your sentence. Okay. What she attaches in Exhibit C to a Second Amendment complaint made it clear it was only a stock purchase for outdoor stock. Assuming, arguendo, that we recognize completely this proposition about the parent and the subsidiary, did Outdoor indirectly solicit or encourage Cranky to make an offer for the ACB by attempting to provide veto rights in the March 21st letter? Can you address that? Yeah, I'll be happy to address that. First of all, in order to do that, I will correct something, which is there was a judicial admission made by Solomon's counsel, Mr. Ibrahim, who was affiliated at the time with Mr. Abinanti. There was a judicial admission made in Daubert hearing that this purchase is unambiguous. And as Judge Smith rightly pointed out, it doesn't matter whether it was a Daubert hearing or whether it was a hearing on the motion for summary judgment. It was in response to a direct question from Chief Judge Lynn that it was unambiguous, and the significance of that was it resulted in the exclusion of our expert. What does the association with Abinanti have to do with this? It's really nothing other than the fact that they were representing him. Mr. Abinanti did appear on telephone conferences. He was not at that hearing. You lie down with dogs, you get up with fleas, that's all. Sorry. Yeah, and I didn't mean to take, they were just the trumpets, both of them, and they both appeared at various hearings. But, and so getting back to Judge Ibrahim, your point, this was an unambiguous contract, and what does the term sheet say? The term sheet says, shall not directly or indirectly do a number of things, right? Sell, excuse me, correspond, negotiate, solicit, sell, or agree to sell, equity or debt interest of the aerial camera business or material part thereof. It doesn't say, and it might be the intermediate existing term sheet, or excuse me, merger agreement with Outdoor. It couldn't say, oh, by the way, you can't sell Outdoor stock. That's not what it said, and it couldn't say that. So the, under rules of construction, directly or indirectly modify what comes immediately afterwards. Cannot directly or indirectly negotiate. Cannot directly or indirectly correspond with. Cannot directly or indirectly sell. That's what it means. It doesn't mean that you can't sell the Outdoor stock, which then somehow indirectly results in a sale of aerial cameras, because as a matter of law, that doesn't, that just doesn't work. I mean, to use a tautology, a corporate parent can't either directly or indirectly sell a subsidiary unless it sells a subsidiary, and that didn't happen here. And so the March 21 letter, which, by the way, the undisputed evidence from Catherine Lee, who was the general counsel of Outdoor, I took her deposition. The undisputed evidence is that KSC had nothing to do with that March 21 letter. She drafted it. She didn't communicate with KSC about it. KSC didn't know about it until after the fact. Notwithstanding the efforts that Mr. Solomon makes in his briefing to suggest to the contrary, the unrefuted evidence is that, yeah, they may have learned about the March 21 letter after the merger agreement, but before they actually merged, that may have happened. In the due diligence process in connection with the data room, I think it was in there, and there's no dispute about that. So they did learn about that, but it had nothing to do with KSC's purchase of Outdoor stock. The March 21 letter's a complete red herring. Well, more to the point, I mean, I'm inclined to agree that it's, that it it's hard to conceive why Outdoor Channel's general counsel neglected to put Mr. Solomon, since it was his idea or the, allegedly the company had approached him about a buyout of the aerial camera business, and Pacific was his financier. It just seems very unlikely that the general counsel for Outdoor inadvertently overlooked that, whether that implicates your client, it's another matter. Well, and all I can say, Judge, is the undisputed evidence indicates that it was, I mean, it was an oversight. It was an oversight just because she said it was an oversight, but there's no other credibility involved there, right? Is there? That's what I'm saying. I mean, I just, and you can question whether that's true or not true, I guess, at this level, the fact remains that the March 21 letter is just a red herring. It has nothing to do with this case other than to try to create a fact issue, and on that score, I'd like to correct something that Mr. Solomon's counsel said to you today and said in the briefing, and this, I think, highlights the liberties that are taken with this record on this appeal. It illustrates it perfectly. Mr. Solomon's counsel said that there's evidence in the record that Mr. Gluck testified during his deposition, in which I was there, that he believed that there was going to be, the purchase of the outdoor stock was going to be a purchase of the area of Cameron Business. Interestingly, they cite to one page of his deposition transcript and conveniently omit the page right before it. And what does the page right before it say? The page right before it is a question asked by Mr. Solomon's counsel. Did you ever have a conversation with Mr. Harsh, the CEO of Outdoor, or Mr. Allen, the CFO of Outdoor, in which you said that KSC was going to purchase the area of Cameron Business? What was Mr. Gluck's response? And this is the page that was attached to the appeal, to the record, but which isn't complete without knowing the question. And what did Mr. Gluck, how did Mr. Gluck respond? He says, I don't know, I didn't make this, I don't believe I ever made that statement, nor would I have made that statement, because it's, the purchase of the subsidiary is, or the turnstock is not the purchase of the subsidiary. So Mr. Gluck, not, despite the fact Mr. Solomon wants you to believe, he testified to that, he denied that. And that is in the record, and it's in the record on appeal, and yet they perpetuate that myth here in oral argument. There's some other liberties that are taken in the briefing, and suggested during today's argument, and I'd just like to touch on a couple of them, because I don't have time to touch on all of them now. But on page 20 of the opening brief, Mr. Solomon claims that KSC negotiated for and obtained an equity interest in the area of Cameron Business. The undisputed evidence is that KSC never, ever made an offer to acquire any aspect of the area of Cameron Business. It was only the stock of Outdoor. The undisputed evidence is that Outdoor did not negotiate with KSC about acquiring the area of Cameron Business. Ms. Lee, the general counsel, testified about that on page 3566 of the record, and this is all in our briefing. Now Roger Warner, the co-chairman of Outdoor, it doesn't get much higher than that, testified those negotiations never occurred, and the merger agreement and the offer letter make it clear that this was only a purchase of Outdoor stock. Mr. Solomon claims in his opening brief on pages 11 and 40, that there was a pending sale, his words not mine, pending sale of the area of Cameron Business, and that, quote, ACB would have been sold to Solomon, but for KSC and Outdoor. That's just pure fanciful thinking. The record doesn't support that in the least. Here's what the undisputed evidence shows. There never was an agreement between Outdoor, Solomon, and PNC to purchase the area of Cameron Business because they couldn't come to terms. On March 5 of 2013, Outdoor sent an asset purchase agreement to Mr. Solomon and PNC, and within two weeks, before, by the way, the March 21 letter, within two weeks, PNC sends back what Mr. Hornish, the CEO, characterized as a sea of red. When I took his deposition, those were his words, sea of red. He said there was no meeting of the minds on what we were willing to agree to, what PNC and what Mr. Solomon want, and then Catherine Lee testified, the general counsel, that the changes were, quote, very, very, very extensive, her words again, not mine, and that they were not anywhere close, quote, to a pending sale. And that's what precipitated, as the record reflects the March 21 letter, to try and give them more time to do this, and yet they want to turn it back on us. The other interesting point about all this is that Mr. Solomon claims on page 19 of his reply to me is that PNC, quote, had more than enough funds available to finance the transaction. So what? The undisputed evidence from the PNC representative himself, Jeff Holloway, whose deposition I took, is that PNC was not, underscore, not going to fund the entire purchase price, and Solomon admitted that he wasn't contributing the funding. That's on, and that he didn't have the resources, and that's in his response to request for admission number 26, which is page 3349 of the record. Again, that's why they went to find, or try to find, other investors. Mr. Solomon and Mr. Holloway went on an effort to try to attract other investors so that they could fund the acquisition of the aerial camera business, and no one would contribute money. No one would help them fund the acquisition. They didn't have the money to buy the aerial camera business. Even if they had reached an agreement with Outdoor on the terms, which is highly questionable given the sea of red and the other characterizations of their revisions. So, and then finally, the only other point I'd like to make, or two other points, quickly, is on the reply brief on page 8. Mr. Solomon says that KSC, quote, was presented with the opportunity to approve the and not to do so. Again, another extreme liberty taking off the record. KSC wasn't presented with anything to approve or not approve. There was no definitive agreements ever reached between Outdoor and the other, and PNC and Solomon. So, Conrad didn't veto anything. And then finally, on page 23 of his reply brief, Mr. Solomon suggests that he and PNC were in lockstep, and that PNC never objected to this 8% equity proposal that was made by Solomon, which also bleeds into the expert issue, which I don't intend to address today unless the court has issues about it. But Mr. Solomon testified, when I took his deposition, that there was a significant, his words again, quote, significant difference of opinion between himself and PNC about the equity share in the proposed purchaser. That's on page 3704 and 3705 of the record. So, far from PNC never objecting, Mr. Solomon himself admitted during his deposition that there was a significant difference of opinion. They were, between the two of them, they couldn't come to an agreement on who was going to have what, and again, they couldn't come up with the purchase price. So, Mr. Solomon's case, if I can call it that, is founded on pure speculation. I mean, he says, hey, it must be conceivable that KSC instructed Outdoor to prepare this March 21 letter. And it's likely, I'm using his words, from his briefs, opening brief 30 and 32, it's likely that Outdoor was induced by KSC. There's not a shred of evidence in the record to support that your honor. It's just all speculation. And this point about inferences, inferences have to be reasonable, and you can't just ignore the record. Unless the court has any other questions, I'm out of time. Fine, no, that's fine. Thank you very much. Okay, Ms. Clothier, do you have any rebuttal? I have just one quick thing on the jurisdictional issue. My only concern, but a little bit of a rant, my primary concern is that under Rule 55, entry is a false, it's obstructionary for the district court. So, in doing that, making that a rule, it could potentially leave the case in procedural limbo, as mentioned in Brooklyn's case under 2001-23236-38766. That could eventually leave the case forever in limbo. So I would suggest that might not be the proper procedure in that situation. And one thing to go back to, if the coping counsel, you might have thought, probably may have presented the record on when the court, when there is a witness that has conflicting statements on whether it's in testimony at trial or testimony at reversal, that's what conflicts those. The credibility of the statement for the jury to decide is not for the court. It is exclusively on page 30 of the deposition, which is page 4-3-4-6. And if you are aware of a case, you can touch us and my government health counsel. You're aware of a case you made in office, which is Outdoor Channels, correct? You could guess. Outdoor Channels is number 27, correct? I mean, that sounds right. How many of them are asking about a shitter? And then one of them said, and then after our own civil subsidiary, correct? And he said, yes, one of those subsidiaries is stuck, and you have to go through those too. But in your case, you made an offer to purchase all shares of Outdoor Channels, Outdoor Channels Holdings, Inc. That included any and all of our eight ventures that were Outdoor Channels assets, I mean, that's subsidiary, correct? He said, I believe so. So, at any point here, I think that was listening to something to the contrary. That is a credibility issue for the judge himself. He has to ask himself, in his case, that he believes that he was permitting the subsidiary. The law recognizes that the federal self-repair company did not automatically purchase the subsidiary. That does not apply here, because if the actual person or company, however the parent company, is also agreeing to purchase the subsidiary, or believe that they're doing so, that's a separate issue. And then also, there is a lot of evidence that is, you know, that the language that the country uses, whether it's directly or indirectly, so indirectly is not, you know, the fact that that was included in there means that all of these circumstantial evidence issues are relevant. But the fact that they indirectly solicited or they indirectly facilitated the purchase of the subsidiary, prior to the expiration of the term sheet, does, does, you know, vibrate with that issue. The catalog of the term sheet, that's a case, is, um, when, when actually the purchase of the subsidiary, if your country mentions the sale of the, of the aeroplane or businesses, um, as part of their proposal to the, the, um, all of these platforms, when you are looking for a letter, um, in itself, that's a very big issue, whether or not we indirectly reach that, that term sheet. Well, but, excuse me, ma'am, but the term sheet is between outdoor and Solomon and Pacific Northern. The, uh, Crump Key is not a party to the term sheet. I understand that, but I'm not going to go into the whole, whole brief on that issue. Okay. We did, if you want to tell, go back to the situation that you talked about, how they, they have, they were also, they're not liable in the, for the, for the particular reason that we've been applying to memory, um, because they were a party to a lot of the conversation and, um, the actual, uh, action of KFD, um, to, to win outdoors, they, they also breached the, the, the term sheet of the participation in the negotiation. And then the final thing I'd just like to point out about the March 21st letter, um, and that, you know, from the council's early comment that it was an, um, inadvertent, you know, in, um, not leaving him on the stage or putting all of this on it, um, but that, but that does not, you know, that's not the issue on him at all. We, you know, but since you stated it was an inadvertent, that's primarily an issue for us to decide whether or not it was, in fact, inadvertent. And that, that particular black, it's the, it's the lack of the, his name that reads the red flag. It's not a red herring, it's a red flag. So obviously the fact itself is evidence that there was, um, a precludence of the country and, and, and a, uh, an act of, of the intentionally left him off that stage. Um, that letter, those things have not resolved the whole question right now because there's, there's continuing credibility issues and credibility issues that's not stated, whether that's a matter of bargaining or not. Um, these issues are not, um, not, let's see, I'm sorry, let's see if we can look at the totality. Um, there's a couple of, um, if you don't have any more questions, I, I, I can help. Okay. No, thank you. Um, we appreciate your, uh, participation in this way. We appreciate Mr. Evans for showing up, uh, both sides. Why, Ms. Clothier, since you're the, uh, appellant, why don't you, uh, send us your post-argument brief on, um, appellate jurisdiction and Mr. Evans, you don't have to file anything, um, unless you feel moved to do so. Um, so, uh, with that, that's the conclusion of the second argument of the day and the court stands in recess until nine o'clock tomorrow morning.